[No. B125740. Second Dist., Div. One. July 2, 1999.]

MESA FOREST PRODUCTS, INC., Plaintiff and Respondent, v. ST. PAUL MERCURY INSURANCE COMPANY, Defendant and Appellant.

## COUNSEL

Fink & Feldman, Mark A. Feldman, Jeffrey Lewis and Michael Yaro for Defendant and Appellant.

Throckmorton, Beckstrom, Oakes & Tomassian, A. Robert Throckmorton and Robert S. Throckmorton for Plaintiff and Respondent.

## OPINION

**MASTERSON, J.**—This appeal presents the question of whether, in determining if a plaintiff in a contract action has obtained a "judgment" more favorable than an offer to compromise (Code Civ. Proc., § 998), the trial court should take into account the defendant's postoffer payments on the debt. We answer that question in the affirmative.[1]

---

[1]Section 998 provides in part: "Not less than 10 days prior to commencement of trial. . . , any party may serve an offer in writing upon any other party to the action to allow judgment to be taken or an award to be entered in accordance with the terms and conditions stated at that time. [¶] . . . [¶] . . . If the offer is not accepted prior to trial or . . . within 30 days after it is made, whichever occurs first, it shall be deemed withdrawn. . . . [¶] . . . [¶] . . . If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer." (Code Civ. Proc., § 998, subds. (b), (b)(2), (c)(1).) For convenience, all subsequent references to section 998 will be to the Code of Civil Procedure.

## BACKGROUND

Plaintiff Mesa Forest Products, Inc., contracted with California IBA, Inc., a general contractor, to provide lumber for the construction of a public school in Santa Monica, California. St. Paul Mercury Insurance Company, a surety, issued a payment bond guaranteeing the payment of California IBA's subcontractors and suppliers, such as Mesa. The payment bond included an attorneys' fee provision stating that St. Paul would pay reasonable attorneys' fees incurred in any suit brought upon the bond.

On July 9, 1996, Mesa filed this action against California IBA and St. Paul, among others, alleging that it was owed $122,205.24, which included the balance of the contract lumber invoices in the sum of approximately $62,690. In an attempt to resolve the dispute, the parties participated in a mandatory settlement conference and four voluntary settlement conferences, all supervised by the trial court. During the negotiations, Mesa demanded between $119,000 and $150,000. Defendants' highest offer was $90,000. The case did not settle.

On January 22, 1998, California IBA served Mesa with a section 998 offer in the amount of $57,198.28, including attorneys' fees and other costs. The following day, all defendants jointly made a section 998 offer of $62,690, including attorneys' fees and other costs. Mesa did not accept either offer.[2]

On March 3, 1998, after the section 998 offers had expired, California IBA sent Mesa a check for $62,690. An accompanying cover letter stated: "Please find enclosed check No. 92, made payable to Mesa Forest Products in the amount of $62,690.00 representing payment by California IBA for the invoices listed in the second page of your Bill of Particulars . . . ."[3] According to defendants, the $62,690 payment was "voluntary" and "unilateral."

Since the $62,690 payment covered only a portion of the damages sought by Mesa, no claims or defendants were dismissed. The case proceeded to

---

[2] Mesa rejected the second offer, at least in part, because it was "collective," i.e., made jointly by all defendants. Mesa indicated that it would accept such an offer if it were made by certain defendants but not others. None of the defendants made any subsequent offers to compromise.

[3] "Code of Civil Procedure section 454, providing for a bill of particulars, is designed to afford ready relief to a defendant in need of further information concerning the details of an account upon which he has been sued." (*Lewin* v. *Merck & Co., Inc.* (1962) 209 Cal.App.2d 131, 133 [25 Cal.Rptr. 619].) Section 454 states: "It is not necessary for a party to set forth in a pleading the items of an account therein alleged, but he must deliver to the adverse party, within ten days after a demand thereof in writing, a copy of the account, or be precluded from giving evidence thereof. The court or judge thereof may order a further account when the one delivered is too general, or is defective in any particular."

trial by jury on March 19, 1998. In presenting their arguments and evidence, counsel for the parties informed the jury that California IBA had already paid Mesa $62,690. The jury found in favor of Mesa and against all defendants and awarded $13,205.85 in damages.

In a series of posttrial motions Mesa and St. Paul sought to recover attorneys' fees and other costs. Mesa argued that it was the prevailing party and was entitled to attorneys' fees pursuant to the provisions of the payment bond. St. Paul asserted that, because the jury awarded less than the amount of its offer to compromise, section 998 precluded Mesa from recovering its postoffer attorneys' fees and other costs. St. Paul argued that it was entitled to attorneys' fees and costs incurred after the date of the offer.

. In applying section 998, the trial court did not simply compare the verdict ($13,205.85) to St. Paul's section 998 offer ($62,690). Instead, the court compared the verdict ($13,205.85) plus California IBA's postoffer payment ($62,690) to the offer to compromise ($62,690). Because Mesa's total recovery ($75,895.85) exceeded the section 998 offer, the trial court ruled that St. Paul was not entitled to postoffer costs. By minute order dated June 24, 1998, the trial court awarded attorneys' fees and other costs (preoffer and postoffer) to Mesa.

Judgment was entered on August 28, 1998. As against St. Paul, the trial court awarded a total of $86,797.47, consisting of.$13,205.85 in damages, $70,000 in attorneys' fees, and costs of $3,591.62.[4] St. Paul filed a timely appeal.

DISCUSSION

In construing section 998, we review the trial court's decision de novo. (See *Bodell Construction Co.* v. *Trustees of Cal. State University* (1998) 62 Cal.App.4th 1508, 1515 [73 Cal.Rptr.2d 450].) With respect to the validity, or reasonableness, of a section 998 offer, we review the trial court's determination for an abuse of discretion. (See *Elrod* v. *Oregon Cummins Diesel, Inc.* (1987) 195 Cal.App.3d 692, 697-698, 700 [241 Cal.Rptr. 108].)

" 'The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. . . .' . . . In determining that intent, we first examine the words of the statute itself. . . . Under the so-called 'plain meaning' rule, courts

---

[4]The judgment recited that California IBA and St. Paul were jointly and severally liable for the damages and ordinary costs. The award of attorneys' fees was against St. Paul alone.

seek to give the words employed by the Legislature their usual and ordinary meaning. . . . If the language of the statute is clear and unambiguous, there is no need for construction. . . . However, the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose. . . . If the terms of the statute provide no definitive answer, then courts may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. . . . ' "We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." . . .' . . . The legislative purpose will not be sacrificed to a literal construction of any part of the statute." (*Bodell Construction Co.* v. *Trustees of Cal. State University, supra,* 62 Cal.App.4th at pp. 1515-1516, citations omitted.)

■ The purpose of section 998 is to "encourage settlement by providing a strong financial disincentive to a party—whether it be a plaintiff or a defendant—who fails to achieve a better result than that party could have achieved by accepting his or her opponent's settlement offer." (*Bank of San Pedro* v. *Superior Court* (1992) 3 Cal.4th 797, 804 [12 Cal.Rptr.2d 696, 838 P.2d 218].) As applied in the present case, "[t]he basic premise of section 998 is that plaintiffs who reject reasonable settlement offers and then obtain less than the offer should be penalized for continuing the litigation. The harsh result of section 998 is that the plaintiff not only loses the right to recover his or her [postoffer] costs, but must also pay the defendant's postoffer costs." (*Meister* v. *Regents of University of California* (1998) 67 Cal.App.4th 437, 450 [78 Cal.Rptr.2d 913].) Simply put, section 998 "penalizes a plaintiff who fails to accept what, in retrospect, is seen to have been a reasonable offer." (*Harvard Investment Co.* v. *Gap Stores, Inc.* (1984) 156 Cal.App.3d 704, 713 [202 Cal.Rptr. 891].)

■ As stated, St. Paul's offer to compromise was for $62,690. Under section 998, if Mesa did not obtain a "judgment" more favorable than $62,690, it cannot recover its postoffer attorneys' fees or other costs (approximately $31,255), and it will have to pay St. Paul's fees and costs for that period (approximately $28,448).[5]

■ It is well established that where, as here, the section 998 offer includes costs, the plaintiff's *preoffer* costs are included in deciding whether the "judgment" is more favorable than the offer; *postoffer* costs are excluded.

---

[5]Some of the figures in this opinion vary from those of the parties. On occasion, the parties did not provide adequate citations to the record with respect to their figures. In those instances, we have attempted to calculate accurate figures on our own.

(See *Heritage Engineering Construction, Inc.* v. *City of Industry* (1998) 65 Cal.App.4th 1435, 1441-1442 [77 Cal.Rptr.2d 459].) St. Paul contends that the term "judgment," as used in section 998, is limited to a plaintiff's preoffer costs and the damages recovered at trial. In addition, St. Paul argues that because the $62,690 payment was made *after* the section 998 offer, it should be excluded from consideration. (See generally, Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial 3 (The Rutter Group 1998) ¶¶ 12:647-12:667, pp. 12(II)-24 to 12(II)-27 rev. # 1, 1998 [plaintiff's postoffer costs not included in determining if judgment more favorable than offer].)

 Under the approach urged by St. Paul, Mesa's preoffer attorneys' fees and other costs (approximately $42,000) would be added to the jury's award ($13,205.85). Those amounts together ($55,205.85) would then be compared to the section 998 offer ($62,690). Because, under this analysis, the "judgment" would not be more favorable than the offer to compromise, Mesa would be subject to the cost-shifting penalties of section 998.

For its part, Mesa responds: "To quote Mr. Bumble, 'If the law supposes that, . . . the law is a ass—a idiot.' (Charles Dickens, Oliver Twist, ch. 51.) . . . [¶] . . . Under St. Paul's interpretation, virtually all plaintiffs in a breach of contract action, which provides for attorneys' fees and costs to the prevailing party, would be held hostage to a crafty defendant's 998 offer." Mesa argues that we should adopt the trial court's analysis, which includes the $62,690 payment in determining the amount of the "judgment."

At the outset, we find nothing in the language of section 998 to guide our inquiry. "Section 998 . . . does not define the term 'more favorable judgment' . . . ." (*Bodell Construction Co.* v. *Trustees of Cal. State University*, *supra*, 62 Cal.App.4th at p. 1520.) Turning elsewhere, we note that the Code of Civil Procedure defines "judgment" as "the final determination of the rights of the parties in an action or proceeding." (Code Civ. Proc., § 577.) More specifically, "[t]he word 'judgment' in Code of Civil Procedure section 998 indicates that the statute contemplates that an offer to compromise which is accepted will result in the final disposition of the underlying lawsuit; the statute does not indicate any intent to limit the terms of the compromise settlement or the type of final disposition." (*Goodstein* v. *Bank of San Pedro* (1994) 27 Cal.App.4th 899, 906 [32 Cal.Rptr.2d 740].)

As one Court of Appeal has observed, "section 998 is completely silent on the question of whether [a particular item] is to be included or excluded by the court in determining . . . whether the judgment obtained by the plaintiff is 'more favorable' than the defendant's offer to compromise." (*Bodell*

*Construction Co.* v. *Trustees of Cal. State University, supra,* 62 Cal.App.4th at p. 1523, fn. omitted.) We agree.[6]

Absent direction from the language of section 998, we look to the statute's purpose: to "punish[] a party who fails to accept a *reasonable* offer from the other party." (*Hurlbut* v. *Sonora Community Hospital* (1989) 207 Cal.App.3d 388, 408 [254 Cal.Rptr. 840], italics in original; accord, *Bank of San Pedro* v. *Superior Court, supra,* 3 Cal.4th at p. 804; *Meister* v. *Regents of University of California, supra,* 67 Cal.App.4th at p. 450; *Bodell Construction Co.* v. *Trustees of Cal. State University, supra,* 62 Cal.App.4th at p. 1525.) ▮ "To effectuate the purpose of the statute, a section 998 offer must be made in good faith to be valid. . . . Good faith requires that the pretrial offer of settlement be 'realistically reasonable under the circumstances of the particular case. . . .' . . . The offer 'must carry with it some reasonable prospect of acceptance. . . .' . . . One having no expectation that his or her offer will be accepted will not be allowed to benefit from a no-risk offer made for the sole purpose of later recovering [costs]." (*Jones* v. *Dumrichob* (1998) 63 Cal.App.4th 1258, 1262-1263 [74 Cal.Rptr.2d 607], citations omitted.)

By way of example, in *Pineda* v. *Los Angeles Turf Club, Inc.* (1980) 112 Cal.App.3d 53 [169 Cal.Rptr. 66], the plaintiffs brought a wrongful death action, seeking $10 million in damages. A month before trial, the defendant made a section 998 offer of $2,500. It was rejected. Thereafter, the case was tried, resulting in a defense verdict. The defendant sought to recover its costs, including more than $24,000 in expert witness fees.[7] The trial court disallowed the cost of the experts. The Court of Appeal affirmed, stating: "Under the circumstances of this case the trial court had ample reason to find that the offer was not reasonable. Although [the defendant's] liability was tenuous indeed, having in mind the enormous exposure[,] the trial court could find that [the defendant] had no expectation that its offer would be accepted. From this it follows that the sole purpose of the offer was to make [the defendant] eligible for the recovery of large expert witness fees at no real risk." (*Id.* at p. 63.)

In *Wear* v. *Calderon* (1981) 121 Cal.App.3d 818 [175 Cal.Rptr. 566], the plaintiff, a passenger in a two-car accident, sued both drivers for personal

---

[6]In *Bodell,* the question was whether to include prejudgment interest in determining the amount of the "judgment." The court held that "*post*offer prejudgment interest awarded to the plaintiff under Civil Code section 3287 must be excluded in determining whether the plaintiff has obtained a judgment 'more favorable' than the defendant's offer." (62 Cal.App.4th at p. 1517.) However, "any *pre*offer prejudgment interest . . . must be included . . ." (*Ibid.*)

[7]Under section 998, if a plaintiff rejects a defendant's offer to compromise and fails to obtain a more favorable judgment, the trial court has the discretion to award expert witness fees to the defendant. (§ 998, subd. (c)(1).)

injuries. One of the defendants made a section 998 offer of $1, which was rejected. The jury returned a verdict in favor of that defendant but awarded $18,500 against the other one. Pursuant to section 998, the trial court awarded expert witness fees to the exonerated defendant. The Court of Appeal reversed, explaining: "[I]f there is some reasonable possibility, however slight, that a particular defendant will be held liable, there is practically no chance that a plaintiff will accept a token or nominal offer of settlement from that defendant in view of the current cost of preparing a case for trial." (121 Cal.App.3d at p. 821.)[8]

"As a general rule, the reasonableness of a defendant's offer is measured, first, by determining whether the offer represents a reasonable prediction of the amount of money, if any, defendant would have to pay plaintiff following a trial, discounted by an appropriate factor for receipt of money by plaintiff before trial, all premised upon information that was known or reasonably should have been known *to the defendant*. It goes without saying that a defendant is not expected to predict the exact amount of his exposure. If an experienced attorney or judge, standing in defendant's shoes, would place the prediction within a range of reasonably possible results, the prediction is reasonable. . . .

"If the offer is found reasonable by the first test, it must then satisfy a second test: whether defendant's information was known or reasonably should have been known to plaintiff. This second test is necessary because the section 998 mechanism works only where the [plaintiff] has reason to know the offer is a reasonable one. If the [plaintiff] has no reason to know the offer is reasonable, then [he] cannot be expected to accept the offer.

"Thus, suppose defendant's files contain 'dynamite' information likely to insulate it from liability. . . . Unless defendant communicates its exclusive knowledge to plaintiff with its offer, the offer is not reasonable and does not qualify as a valid section 998 offer. Since defendant knew or reasonably should have known plaintiff lacked information necessary to evaluate the offer, defendant did not make the offer in good faith for purposes of section 998. [¶] However, we emphasize the reasonableness of defendant's offer does not depend on information actually known to plaintiff but rather on information that was *known or reasonably should have been known.*" (*Elrod*

---

[8]Although *Pineda* and *Wear* addressed the recovery of expert witness fees, the requirement that a section 998 offer be "reasonable" and "realistic" applies regardless of the type of costs being sought. (See *Elrod* v. *Oregon Cummins Diesel, Inc., supra*, 195 Cal.App.3d at pp. 695-698.)

v. *Oregon Cummins Diesel, Inc., supra*, 195 Cal.App.3d at p. 699, italics in original, citation and fn. omitted.)[9]

■ Based on these principles, we conclude that Mesa is not subject to the cost-shifting penalties of section 998. Throughout the parties' dispute, the amount owed on the outstanding lumber invoices was ascertainable: $62,690. Rather than make payment when due, St. Paul played hardball, forcing Mesa to bring this action. If Mesa ultimately prevailed, St. Paul would be liable for at least $62,690 in damages.[10] And, as provided in the payment bond, St. Paul would also have to pay Mesa's attorneys' fees.

After a year and a half of litigation, St. Paul decided to make an offer to compromise. The trial was two months away. As of January 23, 1998, the day of the offer, Mesa had incurred—by St. Paul's calculation—approximately $42,000 in attorneys' fees and other costs. Thus, if Mesa had accepted the $62,690 offer, it would have settled for a net gain of $20,690— approximately one-third of what it was owed on the lumber invoices. Such an offer hardly sounds realistic or reasonable. Nevertheless, St. Paul contends that Mesa should be penalized for rejecting it.

Of course, St. Paul's argument presupposes that the postoffer payment of $62,690—made two weeks before trial—should not be considered in determining Mesa's success. Yet, in light of the evidence and arguments presented at trial, the jury considered the payment in reaching its verdict. Indeed, the parties could just as easily have kept that information from the jury and had the trial judge offset the verdict. Regardless, the "Judgment on Jury Verdict" reflects that, as a consequence of this litigation, Mesa recovered $75,895.85 in contract damages: $62,690 paid by California IBA and $13,205.85 awarded by the jury. To say otherwise would exalt form over substance, which is to be avoided. (See Civ. Code, § 3528.)[11]

Given that Mesa recovered $75,895.85 in damages and incurred $42,000 in preoffer attorneys' fees and other costs, for a total of approximately $117,900, Mesa "achieve[d] a better result than [it] could have achieved by accepting [its] opponent's settlement offer [of $62,690]." (*Bank of San Pedro*

---

[9]Mesa does not contend that St. Paul had superior knowledge about the merits of the case. Consequently, St. Paul's offer to compromise satisfied *Elrod*'s second test.

[10]As noted, Mesa alleged that it was owed $122,205.24. The jury awarded $13,205.85 over and above the $62,690.

[11]The parties treat California IBA's postoffer payment as if it had been made by St. Paul. As stated, the relationship between California IBA and St. Paul was one of principal and surety, respectively. (See Civ. Code, §§ 2808-2810 [discussing liability of sureties]; *T&R Painting Construction, Inc.* v. *St. Paul Fire & Marine Ins. Co.* (1994) 23 Cal.App.4th 738 [29 Cal.Rptr.2d 199] [same].)

v. *Superior Court, supra,* 3 Cal.4th at p. 804.) In short, Mesa did not "obtain less than the offer." (*Meister* v. *Regents of University of California, supra,* 67 Cal.App.4th at p. 450.)[12]

Moreover, we note that St. Paul's argument, if carried to its logical conclusion, would produce results more absurd than the one here. The payor under a contract could simply withhold payment in hopes that the payee will go away. If the payee files suit, the payor could promptly make a section 998 offer that covers a substantial portion of the debt but which would not be accepted, e.g., $50,000 on a claim of $100,000. Then, on the eve of trial, the payor could unilaterally send the payee a check for $75,000. At trial, the payee would recover $25,000. Thereafter, in ruling on posttrial motions, the trial court would find that the payee did not obtain a "judgment" more favorable than the offer to compromise. As a result, the payee, despite its status as the prevailing party, would be entitled to recover only its filing fee and the cost of service of process. The payor, on the other hand, would be entitled to recover all of its costs, including attorneys' fees if the contract so provided. Under this scenario, the payee could celebrate a pyrrhic victory.

In contrast, our interpretation of section 998 " '. . . comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid[s] an interpretation that would lead to absurd consequences.' " (*Mercy Hospital & Medical Center* v. *Farmers Ins. Group of Companies* (1997) 15 Cal.4th 213, 219 [61 Cal.Rptr.2d 638, 932 P.2d 210].)[13]

It follows that the trial court properly included the postoffer payment of $62,690 in deciding whether the judgment was more favorable than St. Paul's offer to compromise. In so doing, the trial court was faithful to section 998's goal of assessing settlement proposals in practical, realistic terms. (See *Murillo* v. *Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 1001 [73 Cal.Rptr.2d 682, 953 P.2d 858]; *Jones* v. *Dumrichob, supra,* 63

[12]In hindsight, Mesa's settlement demands during the mandatory and voluntary settlement conferences—$119,000 to $150,000—were quite reasonable. If California IBA's postoffer payment is considered together with the jury verdict and the trial court's award of attorneys' fees and other costs, Mesa's total recovery was approximately $149,500.

[13]St. Paul's reliance on *Syverson* v. *Heitmann* (1985) 171 Cal.App.3d 106 [214 Cal.Rptr. 581] is misplaced. That decision involved the interplay between section 998 and Code of Civil Procedure section 877, which " 'requires that a judgment be reduced by amounts paid by settling joint tortfeasors.' " (171 Cal.App.3d at p. 110, italics omitted; see *Manthey* v. *San Luis Rey Downs Enterprises, Inc.* (1993) 16 Cal.App.4th 782, 789-791 [20 Cal.Rptr.2d 265].) Thus, *Syverson* is of no relevance in this case.

Cal.App.4th at p. 1262; *Stell* v. *Jay Hales Development Co.* (1992) 11 Cal.App.4th 1214, 1231 [15 Cal.Rptr.2d 220], disapproved on other grounds in *Citizens for Covenant Compliance* v. *Anderson* (1995) 12 Cal.4th 345, 359 [47 Cal.Rptr.2d 898, 906 P.2d 1314].)[14]

Finally, St. Paul contends that the $62,690 payment should be excluded because it was made *after* the offer to compromise. For that contention, St. Paul relies on the general rule that a plaintiff's postoffer costs are not considered in determining whether a more favorable judgment has been obtained. (See *Bodell Construction Co.* v. *Trustees of Cal. State University, supra,* 62 Cal.App.4th at pp. 1517-1523 [discussing cases].) But the general rule must be applied in accordance with its purpose: ▮ "[W]here the plaintiff refuses an offer of compromise by the defendant, costs incurred by the plaintiff before the time of the offer are added to the award of damages for purposes of determining whether the judgment is 'more favorable' than the offer, but costs incurred after the offer are excluded from the calculation. . . . The rationale for this rule is that allowing the addition of postoffer costs would defeat the purpose of [section] 998(c) . . . [by] enabl[ing] the plaintiff to increase the amount of the 'judgment' simply by driving up postoffer costs." (6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 90(a), p. 492, citations omitted; accord, *Bodell Construction Co.* v. *Trustees of Cal. State University, supra,* 62 Cal.App.4th at pp. 1520-1522, 1526.)

Plainly, our conclusion that a defendant's postoffer contract payment should be considered in determining a plaintiff's success does not permit a plaintiff to inflate the judgment through postoffer conduct. On the contrary, our decision ensures that a defendant's offer to compromise will remain "realistically reasonable under the circumstances of the particular case." (*Wear* v. *Calderon, supra,* 121 Cal.App.3d at p. 821.)[15]

---

[14]According to St. Paul, the trial court found its section 998 offer to be reasonable. Not so. In denying St. Paul's motion for attorneys' fees, the trial court told defense counsel that St. Paul's argument "does not make any sense whatsoever[.] They can get $13,000 more than you paid them, basically, the offer. They get $13,000 more. And you want your costs? You're not getting it out of this court . . . ."

[15]Any request for attorneys' fees on appeal should be addressed to the trial court on remand. (Cal. Rules of Court, rule 26(a)(4); *People* ex rel. *Cooper* v. *Mitchell Brothers' Santa Ana Theater* (1985) 165 Cal.App.3d 378, 387-388 [211 Cal.Rptr. 501]; *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 176-177 [217 Cal.Rptr. 893].)

## DISPOSITION

The judgment, including the award of attorneys' fees and other costs, is affirmed.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.

Appellant's petition for review by the Supreme Court was denied October 20, 1999.